# Illinois Official Reports

## Appellate Court

---

### *People v. Contreras*, 2014 IL App (1st) 131889

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JOSE CONTRERAS, Defendant-Appellee. |
| | |
| District & No. | First District, Third Division<br>Docket No. 1-13-1889 |
| | |
| Filed | November 19, 2014 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's order quashing defendant's arrest and suppressing the evidence obtained in a warrantless search of the vehicle he was driving was reversed and the cause was remanded for further proceedings, since the police had probable cause to conduct a warrantless search of the vehicle after it was stopped on a public street for a minor traffic violation, the observation that the occupants were not wearing seat belts, and that probable cause was based on information the officers obtained from an informant that the vehicle had an illegal secret compartment that was used by the occupants to deliver narcotics; therefore, no warrant was necessary to search the vehicle at the scene of the stop, and the officers' decision to take the vehicle to a nearby police station to avoid the busy intersection where the stop occurred and go to a location where the search could be conducted safely was reasonable, regardless of the delay in conducting the search and the fact that they did not know the specific contents of the bag they saw being placed somewhere in the backseat area of the car. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-2029; the Hon. Nicholas Ford, Judge, presiding. |
| | |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
|---|---|
| | Marvin Bloom, of Chicago, for appellee. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1 The State appeals the trial court's order granting defendant Jose Contreras' motion to quash his arrest and suppress evidence recovered from a warrantless search of a vehicle he was driving. Following a traffic stop, police believed probable cause existed that the vehicle contained a secret compartment in violation of section 12-612 of the Illinois Vehicle Code (625 ILCS 5/12-612 (West 2010)) and relocated the vehicle to a police station where the vehicle was searched, revealing a secret compartment containing heroin, cocaine, firearms and a large sum of currency. The State claims police had probable cause to search the vehicle without a warrant on the public street where the vehicle was stopped and that probable cause continued to exist after the vehicle was relocated to a police station. We agree and, therefore, reverse and remand for further proceedings.

¶ 2 BACKGROUND

¶ 3 On December 29, 2011, Contreras was arrested on 2 counts of possession of a controlled substance with intent to deliver and 10 counts of unlawful use or possession of a weapon by a felon. Contreras filed a motion to quash arrest and suppress evidence relating to the search of a 1998 gold Cadillac Catera he was driving on December 29, 2011, asserting the stop, arrest and subsequent search of the vehicle were conducted without a warrant or probable cause in violation of his constitutional rights. In response, the State asserted the search of the vehicle at the police station was supported by the probable cause the officers developed at the scene, which indicated that the vehicle contained an illegal "car trap." The following evidence was adduced at the hearing on Contreras' motion.

¶ 4 Contreras' arrest resulted from investigative tips provided by George Kasp after he was arrested for delivering heroin to an informant. Kasp was a target of an investigation known as "Operation Triple Threat" conducted jointly by the gang investigations unit of the Chicago police department and the federal Drug Enforcement Administration. Prior to Kasp's arrest, Contreras was not a target of that investigation and he was unknown to the investigating officers. Chicago police officers George Lopez, Daniel DeLopez, Edmund Zablocki, and Joe Wagner and Sergeant Matthew Cline participated in "Operation Triple Threat." As part of the investigation, police arranged for an informant to purchase heroin from Kasp at a restaurant located in the 2900 block of West Chicago Avenue. After Kasp sold the heroin, he was

arrested at approximately 2:50 p.m., along with his codefendant, Dionicoiso Garcia. Both men were then transported to the Homan Square station, which is the location of the Chicago police department's organized crime bureau.

¶ 5    During questioning by Officer Zablocki, Kasp told him he wanted to cooperate. Sergeant Cline was also present for the first part of Kasp's interview. Using a Nextel telephone, Officer Zablocki relayed the information Kasp told him during the interview, almost instantaneously, to Officers DeLopez, Lopez and Wagner and, after he left, Sergeant Cline. In fact, everyone on the investigative team either broadcasted or received information on the Nextel devices.

¶ 6    During questioning, Kasp identified "Jose" as his heroin supplier and stated that earlier in the day, Jose and "Pedro" brought heroin to his house, located at 2243 West Grand Avenue in Chicago. Kasp either did not recall or did not know Jose's and Pedro's surnames. The men arrived at Kasp's house in a gold Cadillac, and Kasp opened a back gate allowing the vehicle to park in the back of his house. Kasp observed Pedro remove a brown paper bag from a hidden compartment in the rear of the vehicle and the men then entered Kasp's house. Once inside, Jose handed Kasp the brown paper bag, which contained heroin, and Kasp placed it on a butcher block cabinet in his kitchen.

¶ 7    Kasp indicated that additional narcotics were inside his house, as well as two handguns and approximately $23,000. One gun was located in a black bag on the rear porch of his house and one was on a stool next to a butcher block cabinet inside his house. Approximately 150 grams of heroin were inside the brown paper bag located on top of the butcher block, which was the amount of heroin remaining after Kasp delivered 200 grams to the informant. The brown paper bag was the same bag Jose and Pedro used to deliver the heroin to him.

¶ 8    Kasp verbally consented to a search of his house. He also provided the officers with keys to his house and instructed them how to enter his house through the front door. Sergeant Cline took the keys and went to Kasp's house to assist with surveillance awaiting word that Kasp provided written consent to the search. Kasp signed the consent to search form at 3:27 p.m.

¶ 9    Kasp informed Officer Zablocki that Jose and Pedro might still be inside his house and the gold Cadillac might still be parked there. During the interview, Kasp received numerous telephone calls from Jose on his cell phone and Garcia received telephone calls from the same number. Jose made the telephone calls before leaving Kasp's house.

¶ 10    A short time later, Officer Wagner verified the gold Cadillac was still parked behind Kasp's house in a carport. Officer Wagner communicated the vehicle's license plate on the Nextel to the other officers.

¶ 11    Officer DeLopez was also conducting surveillance of Kasp's house and he communicated his observations to the other officers involved in the investigation. He began his on-foot surveillance of the house approximately 20 to 30 minutes after Kasp's arrest and he was the officer closest to Kasp's house. Officer DeLopez went to the rear of the house, where he also saw a gold Cadillac parked in the carport. Officer DeLopez then relayed via Nextel that he saw two Hispanic males leave the back of Kasp's house. He observed one man carrying a brown paper bag when he walked out of Kasp's house; that individual then proceeded to sit in the front driver's side seat of the gold Cadillac. The other man opened the gate so the vehicle could be backed out into the alley. When vehicle was out of the carport, Officer DeLopez saw the driver still holding the brown paper bag. Once the car was in the alley, the

other man closed the gate and got in the vehicle's front passenger seat. Officer DeLopez noted the vehicle's license plate and reported it to the team. It was determined that the vehicle was registered to Miguel Garcia.

¶ 12 The vehicle then proceeded westbound through the alley. After the vehicle was far enough away where Officer DeLopez thought his point of surveillance would not be revealed, Officer Lopez drove to that location in an unmarked police vehicle and picked DeLopez up.

¶ 13 After driving down the alley to observe the gold Cadillac at the back of Kasp's house, Officer Wagner set up surveillance in the alley one block west of Kasp's house, but still had a view of the alley behind Kasp's house. Officer Wagner saw the gold Cadillac travel westbound down the alley and stop at the mouth of the alley at approximately 3:55 p.m. Officer Wagner had a face-to-face view of the driver after the vehicle stopped. Officer Wagner relayed over the Nextel that after the vehicle stopped, he saw a brown paper bag in the driver's hand; the driver then turned his body right reaching into the backseat area of the vehicle. Officer Wagner saw the armrest of the backseat go down and when the driver turned around, the brown paper bag was no longer in his hand. The vehicle then traveled southbound down Oakley Boulevard out of his view. Officer Wagner considered the driver's movements significant because Officer Zablocki had communicated that a car trap or secret compartment may be located near the vehicle's backseat.

¶ 14 After relocating to the vicinity of Kasp's house to assist in the surveillance, Sergeant Cline parked his vehicle on Oakley. He saw the gold Cadillac immediately after it turned onto Oakley and began following it. Sergeant Cline still followed the vehicle as it turned onto Western Avenue. As the vehicle turned onto Western, Sergeant Cline observed neither the vehicle's driver nor passenger wearing a seat belt and decided the vehicle should be pulled over for further investigation. At approximately 4 p.m., Sergeant Cline instructed Officers Lopez and DeLopez to stop the gold Cadillac. Sergeant Cline never lost sight of the vehicle before the officers stopped it and he did not see a brown bag thrown or dropped out of the vehicle. After Sergeant Cline determined the officers were safe and the vehicle's occupants were cooperating, he relocated to Kasp's house to assist in surveillance of the house.

¶ 15 At approximately 3:55 p.m., Officers Lopez and DeLopez were in the vicinity of 210 North Western Avenue in Chicago. Following Sergeant Cline's orders, they conducted a traffic stop of the gold Cadillac because its occupants were not wearing seat belts. The officers, however, did not issue a ticket for the seat belt violation. As Officer Lopez walked toward the gold Cadillac, he looked inside the vehicle for his safety. He did not see a brown paper bag anywhere on the backseat or floorboard and the floorboard had no holes. From Officer Zablocki's communications, he knew Kasp stated the vehicle contained a car trap. Officer Lopez was familiar with car traps, and because he had been advised the driver appeared to place the brown paper bag in the rear of the vehicle and no brown paper bag was seen anywhere on the backseat, he believed the car trap was in the rear of the vehicle.

¶ 16 Officer Lopez proceeded to speak to the vehicle's occupants, who identified themselves as Jose Contreras and Pedro Martinez. Contreras was driving the car. Contreras was unable to provide proof of insurance. Officer Lopez asked Contreras who owned the vehicle and Contreras responded, "a friend," but could not give the friend's name. Officer Lopez asked the men if they knew Miguel Garcia, the vehicle's registered owner, and they both responded no.

¶ 17    While Officer Lopez spoke to Contreras, Officer DeLopez stayed at the vehicle's passenger's side rear door. Officer DeLopez looked inside the vehicle, but did not see anything in the backseat resembling the brown paper bag he previously saw Contreras carrying. During the time he and Officer Lopez followed the gold Cadillac, they did not observe anything thrown from the vehicle.

¶ 18    After the officers conducted the traffic stop, Officer Lopez ordered Contreras and Martinez to exit the vehicle and they were placed in handcuffs. The officers did not have an arrest warrant and they did not attempt to obtain a search warrant. While the vehicle was on the street and Contreras was detained, Officer DeLopez entered the vehicle and briefly looked inside, but did not see any contraband or car traps.

¶ 19    As the traffic stop was unfolding, Officers Lopez and DeLopez informed Sergeant Cline what was occurring. Because it was dark outside and the vehicle was stopped near the busy intersection of Western Avenue and Lake Street, Sergeant Cline felt it was in everyone's best interest and safety to relocate the vehicle as well as its occupants to Homan Square rather than bring a narcotics dog to the scene. Accordingly, Sergeant Cline ordered the gold Cadillac to be relocated to Homan Square, which was approximately a five-minute drive from where the vehicle was pulled over.

¶ 20    Within five minutes of the traffic stop, Officer Lopez drove Contreras and Martinez to Homan Square. Pursuant to Sergeant Cline's order, but without Contreras' permission or a warrant, Officer DeLopez drove the vehicle to Homan Square.

¶ 21    When Contreras and Martinez arrived at Homan Square, they were placed in an interview room. After the gold Cadillac arrived at Homan Square, the canine unit was called to do a "sniff" of the vehicle, which was conducted at approximately 5:30 p.m. When the canine positively identified contraband, Sergeant Cline instructed Officers Lopez and DeLopez to enter the vehicle and conduct a search. Officer Lopez noticed a car trap in the rear of the vehicle. The officers circumvented the vehicle's electronics and opened the car trap. Inside the trap, the officers found a brown paper bag containing heroin, which Officer DeLopez recognized as the bag he earlier saw in Contreras' possession, along with additional cocaine, four firearms and $21,000. No search warrant was obtained for the canine "sniff" or the actual search of the vehicle.

¶ 22    After the Cadillac was stopped and Contreras was at Homan Square, a search was also performed of Kasp's home at 4:06 p.m. During the search, officers recovered $15,000 from behind a refrigerator, cannabis and some "mushrooms." Neither the $23,000 Kasp mentioned nor the brown paper bag containing the heroin was recovered.

¶ 23    On January 28, 2013, the trial court found that probable cause to search the vehicle existed predicated on the information provided by Kasp, but found officers should have obtained a search warrant to conduct the vehicle search at Homan Square and prior to opening the car trap because exigent circumstances no longer existed. On February 7, 2013, the State filed a motion to reconsider, which the trial court denied. The State filed a certificate of substantial impairment and timely appealed.

¶ 24                                    ANALYSIS

¶ 25    The State appeals the trial court's order granting Contreras' motion to suppress claiming once probable cause existed after the vehicle was pulled over, no warrant was necessary to

conduct a search regardless of whether the search was performed at the scene or at the police station. In response, Contreras contends that no probable cause existed to search the vehicle either at the scene or at the police station.

¶ 26    In reviewing a trial court's ruling on a motion to suppress, the trial court's findings of fact are given great deference and this court will reverse those findings only if they are against the manifest weight of the evidence. *People v. Cregan*, 2014 IL 113600, ¶ 22. A decision is against the manifest weight of the evidence "only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *People v. Clark*, 2014 IL App (1st) 130222, ¶ 26. We review *de novo* the trial court's legal ruling regarding the suppression of evidence. *Cregan*, 2014 IL 113600, ¶ 22.

¶ 27    The fourth amendment to the United States Constitution protects individuals " 'against unreasonable searches and seizures *** and no Warrants shall issue, but upon probable cause *** and particularly describing the place to be searched, and the persons or things to be seized.' " *People v. James*, 163 Ill. 2d 302, 311 (1994) (quoting U.S. Const., amend. IV). The protections provided by the fourth amendment are applied to states through the fourteenth amendment. *James*, 163 Ill. 2d at 311. Those constitutional safeguards protect against unreasonable warrantless searches. *People v. Stout*, 106 Ill. 2d 77, 86 (1985).

¶ 28    A recognized exception to the fourth amendment's warrant requirement is the "automobile exception," which is based on the understanding that automobiles may be readily driven away often rendering it impossible for officers to obtain warrants for their search. *Id.* Under the automobile exception, police officers may search a vehicle without a warrant where probable cause exists to believe the automobile contains evidence of criminal activity subject to seizure. *James*, 163 Ill. 2d at 312. Stopping an automobile for a minor traffic violation does not justify a search of the detainee's person or vehicle; instead, the officer must reasonably believe he is confronting a situation more serious than a routine traffic violation. *People v. Jones*, 215 Ill. 2d 261, 271 (2005). The reasonableness of a police officer's conduct must be judged based on his responsibility to prevent crime and apprehend criminals. *Stout*, 106 Ill. 2d at 86-87. After an officer is in possession of facts sufficient to support probable cause to believe that a vehicle contains contraband, the vehicle may be searched without a warrant and the search area includes any interior compartment of the vehicle that might reasonably contain the contraband. *People v. DeLuna*, 334 Ill. App. 3d 1, 17 (2002); see also *United States v. Ross*, 456 U.S. 798, 806 (1982); *United States v. Johns*, 469 U.S. 478, 484 (1985).

¶ 29    Probable cause is a nontechnical concept, not readily reduced to a neat set of legal rules; rather, it is a fluid construct dependent upon the assessment of probabilities in a particular factual context. *Jones*, 215 Ill. 2d at 274. The underlying principle of probable cause is the reasonable belief of guilt. *Id.* In reviewing whether probable cause for a search existed, a court examines the events leading up to the search or seizure viewed from the standpoint of an objectively reasonable law enforcement officer. *Id.*

¶ 30    Here, the evidence adduced at the hearing on the motion to suppress demonstrates probable cause existed to search the vehicle when the officers pulled the vehicle over after observing its occupants were not wearing seat belts. While Kasp was not a prior police informant and only provided information after his arrest, the information Kasp provided to investigative authorities was independently corroborated and verified by the police. Kasp advised the police that: (1) a gold Cadillac was parked behind his house in the carport;

(2) men named "Jose" and "Pedro" were likely still inside his house; (3) "Jose" gave Kasp heroin in a brown paper bag; (4) the gold Cadillac contained a car trap; (5) "Pedro" retrieved the brown paper bag from the vehicle's car trap; and (6) weapons and additional drugs were located in his house.

¶ 31 Officers independently corroborated the following information provided by Kasp: (1) Officers DeLopez and Wagner confirmed the presence of a gold Cadillac at Kasp's house; (2) Officer DeLopez saw two men leave through the back entranceway of Kasp's house who later identified themselves as "Jose" and "Pedro"; (3) Officer DeLopez saw Contreras and Martinez enter the gold Cadillac parked behind Kasp's house; (4) both Officers DeLopez and Wagner saw Contreras holding a brown paper bag at two different locations near Kasp's house; (5) Officer Wagner saw Contreras reach toward the vehicle's backseat holding a brown paper bag, but turn around no longer holding the bag; (6) while Sergeant Cline and Officers Lopez and DeLopez followed the gold Cadillac, they did not observe a brown paper bag being discarded from the vehicle; and (7) Officers Lopez and DeLopez did not see a brown paper bag in the vehicle after it was stopped on the street. Moreover, based on his experience with car traps, Officer Lopez believed an illegal car trap was located at the back of the vehicle given that the brown paper bag was not visible after looking inside the vehicle. Particularly significant was Kasp's statement that Contreras and Martinez supplied him with heroin in a brown paper bag on the day of arrest and additional heroin in a brown paper bag was still in his house after he left to meet the informant. Officer DeLopez later saw Contreras leave Kasp's house holding a brown paper bag.

¶ 32 Based on the totality of those historical facts and viewed from the standpoint of an objectively reasonable law enforcement officer, we agree with the trial court that the officers had a reasonable belief amounting to probable cause the vehicle contained an illegal car trap concealing criminal activity. Consequently, no warrant was necessary to search the gold Cadillac while it was on the street after the officers stopped it for a minor traffic violation. Moreover, the warrantless search would properly have comprised not only the vehicle itself, but any interior compartment. *DeLuna*, 334 Ill. App. 3d at 17.

¶ 33 When the traffic stop occurred at 210 North Western Avenue, the vehicle was located near the busy intersection of Lake and Western and it was dark outside. Sergeant Cline decided conducting a search at the scene was impractical and unsafe given the belief the vehicle contained contraband in a concealed area. Importantly, Kasp also conveyed two guns were located inside his house and both Contreras and Martinez were previously seen leaving his house. We conclude Sergeant Cline's decision to relocate the vehicle a short distance away to Homan Square to facilitate a safe and thorough search of the vehicle was reasonable.

¶ 34 Contreras' arguments claiming the absence of probable cause are not persuasive, namely, that officers did not know the contents of the brown paper bag, Kasp did not state additional contraband or drugs were located inside the gold Cadillac and an initial search of the vehicle at the scene did not reveal contraband. Contrary to Contreras' position, the officers had a reasonable belief the brown paper bag's contents included contraband. Kasp identified Contreras as his regular heroin supplier, he delivered heroin to Kasp in a brown paper bag on that day, the brown paper bag remained inside his house after Kasp left to deliver the heroin to the informant and Kasp observed Martinez retrieve the brown paper bag from a car trap in the gold Cadillac. Further, officers observed Contreras exit Kasp's house in possession of a brown paper bag and also observed him placing that bag in the rear of the Cadillac. Finally,

- 7 -

once the car was stopped, the paper bag was not visible in the rear of the vehicle. Collectively, these facts support a finding of probable cause, even if the officers did not know the specific contents of the brown paper bag because it was reasonable to believe the bag contained narcotics.

¶ 35     Having concluded probable cause for the vehicle's search existed at the scene, we must next determine whether the relocation of the vehicle necessitated a warrant prior to the search at the station. Contreras argues after the vehicle was driven to the police station, exigent circumstances no longer existed and the officers were required to obtain a warrant to further search the vehicle after the canine reacted positively to contraband. We disagree.

¶ 36     We find this court's decision in *People v. Parker*, 354 Ill. App. 3d 40 (2004), instructive. In *Parker*, police officers pulled a minivan over because it lacked a front license plate. *Id.* at 42. During the stop, an officer observed a panel on the dashboard move from an open to a closed position indicating to the officer the possible presence of an illegal false or secret compartment hidden in the dashboard. *Id.* at 43. The officer arrested the minivan's occupants for operating a vehicle with an illegal secret compartment and the officer performed a custodial search of the individuals at the scene revealing small bags of green leafy substance believed to be cannabis on both individuals. *Id.* at 44. The occupants and minivan were transported to the police station where a police expert examined the minivan and discovered contraband in secret compartments. *Id.* This court rejected the defendant's argument that the warrantless dismantling of the vehicle at the police station was improper, reasoning that once officers possessed probable cause to conduct a warrantless search of a vehicle, the delay in searching the vehicle until it was moved to a police station did not diminish the justification for the search. *Id.* at 46. The court further elaborated, " 'probable cause that develops at the scene still obtains at the station house.' " *Id.* (quoting *People v. Beil*, 110 Ill. App. 3d 291, 294 (1982), and citing *Michigan v. Thomas*, 458 U.S. 259, 261 (1982), and *Florida v. Meyers*, 466 U.S. 380, 382 (1984)); see also *People v. Wolsk*, 118 Ill. App. 3d 112, 120 (1983) (police may conduct a warrantless search of a vehicle transported to a police garage because the justification for a warrantless search does not vanish once the vehicle has been immobilized. (citing *Thomas*, 458 U.S. at 261-62)).

¶ 37     Similarly, here, the warrantless search of the vehicle at the police station was justified. We see no reason to depart from *Parker*'s holding, which relied upon the leading cases of *Thomas*, 458 U.S. at 261 (reiterating probable cause supporting a warrantless search when a vehicle is stopped does not vanish after it has been impounded and is in police custody), and *Meyers*, 466 U.S. at 382 (recognizing *Thomas* is controlling law even for a search that was conducted eight hours after the vehicle was impounded). We agree with *Parker*'s reasoning that a delay in searching a vehicle until it is relocated to a police station does not diminish the original justification for the warrantless search.

¶ 38     During oral argument, Contreras' counsel relied heavily on *Illinois v. Caballes*, 543 U.S. 405 (2005), and *United States v. Place*, 462 U.S. 696 (1983), as support for the contention that transporting the vehicle to Homan Square to conduct the "sniff" unlawfully extended the duration of the stop, but such reliance is misplaced. Although *Caballes* and *Place* support the general proposition that the duration of an investigative detention may not be unreasonably prolonged to conduct a "sniff," those cases are distinguishable because, unlike here, the officers did not have probable cause to conduct a "sniff." *Caballes*, 543 U.S. at 407-08; *Place*, 462 U.S. at 709. Under the facts of this case, *United States v. Johns*, 469 U.S. 478,

482 (1985), is dispositive because the officers in that case had probable cause to believe that a vehicle and packages in the back of the vehicle, which were emanating a distinct order of marijuana, contained contraband. The *Johns* court upheld a warrantless search of the packages conducted three days after the packages were removed from the vehicle recognizing "[t]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure." *Id.* at 484. The *Johns* court extended the precedent involving searches of impounded vehicles to the search of the seized packages. *Id.* at 487-88. Thus, contrary to Contreras' position, the holding in *Johns* is not limited only to the search of packages. Applying *Johns* here, the officers were not required to conduct a "sniff" before the vehicle was transported to Homan Square and the length of time that elapsed from the initial stop to the "sniff" does not render the later search unreasonable because there was probable cause for the "sniff."

¶ 39 As previously stated, factors supporting probable cause arose at the scene when the gold Cadillac was pulled over and the probable cause developed at the scene further supported the warrantless search at the police station. *Parker*, 354 Ill. App. 3d at 46; see also *People v. Walls*, 87 Ill. App. 3d 256, 264 (1980) (and cases cited therein) (recognizing warrantless searches may be properly conducted either at the scene or later at the police station). The trial court granted Contreras' motion because it believed the absence of exigent circumstances required the officers to obtain a warrant before searching the vehicle at the police station. But once probable cause for a search is established, exigent circumstances need not exist to conduct a warrantless search nor must a search be performed contemporaneously with the lawful seizure of a vehicle. *Johns*, 469 U.S. at 484; see also *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (interpreting the "automobile exception" to require a separate finding of exigency in addition to a finding of probable cause is contrary to the holdings reached in *Ross*, 456 U.S. 798, and *Pennsylvania v. Labron*, 518 U.S. 938 (1996)). Consequently, the trial court erred in granting Contreras' motion to suppress because a warrant was not necessary to search the vehicle at the police station.

¶ 40 Given our conclusion, we need not address the State's alternative argument that the search was justified as an inventory search of an impounded vehicle, an issue the State failed to raise in the trial court. See *People v. Haywood*, 407 Ill. App. 3d 540, 617 (2011) (when appealing the trial court's order granting a motion to suppress, the State forfeits the right to raise an issue on appeal by failing to first raise the issue in the trial court).

¶ 41                                                    CONCLUSION

¶ 42 For the foregoing reasons, the trial court's order granting Contreras' motion to quash arrest and suppress evidence is reversed and the matter is remanded for further proceedings.

¶ 43 Reversed and remanded.