2017 IL App (3d) 150215

Opinion filed August 16, 2017

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2017

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
|---|---|---|
| Plaintiff-Appellee, | ) ) | Appeal No. 3-15-0215 |
| v. | ) ) | Circuit No. 13-CF-1294 |
| JAVIER PULIDO, | ) ) | Honorable Amy M. Bertani-Tomczak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices Lytton and O'Brien concurred in the judgment and opinion.

## OPINION

¶ 1        Defendant, Javier Pulido, appeals his conviction, arguing that the trial court erred in denying his motion to suppress evidence recovered from a search of his vehicle. We reverse.

¶ 2                                            FACTS

¶ 3        The State charged defendant with unlawful possession of methamphetamine with intent to deliver (720 ILCS 646/55(a)(1), (a)(2)(F) (West 2012)) after narcotics were found in his vehicle on June 11, 2013.

¶ 4        Defendant filed a motion to suppress the evidence obtained from the traffic stop on the basis that he was illegally detained and the vehicle in which he was driving was illegally searched. Subsequently, the State filed a motion *in limine* to admit evidence of a transaction between defendant and an undercover Illinois State trooper six days before the traffic stop. Although the motions were handled in a different order, for clarity, we discuss the evidence adduced from the hearing on the State's motion *in limine* first.

¶ 5                          I. Motion *in limine* June 5, 2013, Transaction

¶ 6        Sergeant Gil Gutierrez, an Illinois state trooper, testified that he was undercover and met defendant near the Illinois-Iowa border on June 5, 2013. The purpose of the meeting was to purchase methamphetamines from defendant. According to Gutierrez, he received information from a confidential informant and was given defendant's telephone number.

¶ 7        Gutierrez contacted defendant by telephone and arranged to meet with him. Defendant arrived in a 1998 tan Dodge minivan with Washington plates. When Gutierrez first observed defendant, the hood of the minivan was up and defendant was standing at the front of the vehicle. The two met in person and exchanged greetings. Defendant told Gutierrez to take a small tube of methamphetamine located "on the hood" of the minivan. Gutierrez did not see defendant remove the tube from any part of the minivan before placing it on the hood of the vehicle. No money was exchanged, and Gutierrez left the area with the drugs. Defendant was not detained.

¶ 8        Gutierrez later provided information of the transaction to Detective Mike Coppolillo but could not recall whether he provided Coppolillo with defendant's name or just the description of the vehicle.

¶ 9        Defendant objected to the admission of the June 5, 2013, transaction on the basis that it was other-crimes evidence. Defendant argued that the transaction occurred six days before

2

defendant's eventual arrest. The trial court admitted the evidence, acknowledging it was prejudicial but finding that its probative value outweighed any prejudice.

¶ 10                                    II. June 11, 2013, Traffic Stop and Search

¶ 11          Detective Coppolillo testified that he was assigned to a multi-jurisdictional task force, NARCINT. On June 11, 2013, Coppolillo was contacted by Sergeant Gutierrez, who relayed information that defendant would be traveling to Illinois with a large quantity of narcotics. Coppolillo was told the vehicle was a tan Dodge minivan with a Washington registration. On cross-examination, Coppolillo testified that he was mistaken when he said that he had information on defendant. Coppolillo only had information on the vehicle description and the plates. Coppolillo did not know who was driving the vehicle, where the suspected drugs may have been located, or when the suspected narcotics were placed in the vehicle. Coppolillo forwarded this information to Trooper Degraff about 30 minutes prior to the traffic stop.

¶ 12          Degraff testified that he communicated with NARCINT agents on June 11, 2013. Degraff met with the agents at a truck stop near I-80. The agents provided Degraff with information about a vehicle, its license plate, and the type of drugs suspected to be inside the vehicle. Degraff forwarded this information to Illinois state trooper Josh Korando (who was working on I-80) and asked him to stop the vehicle.

¶ 13          Korando testified that around 7 p.m. on June 11, 2013, he was informed by Degraff that a tan Dodge minivan with Washington plates was carrying illegal narcotics. Korando did not have a warrant for defendant's arrest. Korando also did not have any information about the driver of the vehicle. Korando did not know what type of drugs were potentially involved or where inside the vehicle the suspected narcotics were located.

¶ 14       About an hour after receiving this information, Korando initiated a traffic stop of defendant's vehicle for speeding along I-80. Korando testified that he had tested and verified that his light detection and ranging device (LIDAR) was working properly at the start of his shift. The LIDAR showed that defendant was traveling seven miles per hour above the posted speed limit. Korando asked defendant about his travel plans and defendant told Korando that he was driving from Washington to New York. Korando asked for and received defendant's driver's license. According to Korando, defendant was sweating, but he did not observe any furtive movements. Korando also did not notice any unusual odors coming from defendant's vehicle. He could see inside defendant's vehicle, but did not observe any contraband. Korando then asked defendant to accompany him into his squad car.

¶ 15       While defendant and Korando spoke inside the squad car, Degraff arrived on the scene (about two minutes after the stop was initiated) with his canine, Rico. Degraff testified that he had training in canine recognition of narcotics and narcotics interdiction. Degraff had been partnered with Rico since February 2012. Rico trained at the Illinois State Police Academy from February to May 2012 to detect the odor of narcotics. Rico had participated in about 50 "real world" narcotics investigations. Rico is a passive alert dog and will alert by a change in body posture and breathing rate. Rico will give a final confirmation by sitting, laying, or standing staring. Rico was certified as a narcotics investigation canine in May 2012. The certification was valid for one year, but had expired May 2013, right before the June 11, 2013, search.

¶ 16       According to Degraff, he and Rico trained twice a month for 10 hours each day at different locations and diverse environments. Rico had broken his leg in October 2012, and did not train again until January 2013. Degraff did not keep records on Rico's accuracy in the field.

4

Degraff stated that Rico had never alerted to a training blank (a room or vehicle that has never contained drugs).

¶ 17     While Korando and defendant were sitting inside Korando's squad car, Degraff deployed Rico and performed a free-air sniff of defendant's vehicle. Rico alerted on the driver's side door of the vehicle. Degraff interpreted this to mean there was an odor of narcotics.

¶ 18     As Degraff performed the free-air sniff, Korando ran defendant's information through Law Enforcement Agencies Data System (LEADS) and determined that defendant had a valid driver's license and no outstanding warrants. Korando then issued a speeding warning to defendant for driving seven miles per hour over the speed limit. The warning was not presented at the motion to suppress.

¶ 19     When Rico alerted on defendant's vehicle, Korando asked defendant if he had illegal drugs in his vehicle, and defendant said that he did not. Korando noticed that defendant began sweating profusely and his carotid artery pulsed noticeably. Korando asked defendant if he could search his vehicle. According to Korando, defendant consented to a search.

¶ 20     A video recording of defendant's conversation with Korando was admitted into evidence. The video appears to malfunction at the time defendant gave his alleged consent to search his vehicle. The video does not conclusively show defendant gave consent to search his vehicle. However, Korando testified that defendant gave him verbal consent.

¶ 21     Korando then gave Degraff a "thumbs up." Both Korando and Degraff (who had worked together previously) testified that they interpreted a "thumbs up" to mean that the driver had consented to the search. Although Degraff never confirmed with Korando that defendant consented to the search beyond seeing the "thumbs up," Degraff began searching the vehicle. Korando also assisted in the search. Both troopers searched the inside of the vehicle, as well as

the engine compartment, but did not find any narcotics. Neither trooper observed anything unusual about the engine compartment. The search lasted around 15 minutes. Approximately 27 minutes and 17 seconds elapsed from the time Korando initiated the stop until the end of the search. Throughout the free-air sniff and the search, defendant remained seated inside Korando's squad car.

¶ 22        According to Degraff, when he and Korando completed a search of the vehicle, he contacted NARCINT agents and informed them of the search results. Although the officers failed to find any narcotics, Degraff believed narcotics could be hidden in the vehicle. According to Degraff, a NARCINT agent then made the decision to relocate the vehicle to the Channahon police department for a further search.

¶ 23        Coppolillo testified that he was near the scene waiting in his vehicle while Korando and Degraff searched defendant's vehicle. He made the decision to relocate defendant and the minivan to the Channahon police department as it had begun raining and due to safety concerns. Despite the troopers' failure to recover any narcotics from the search, defendant and his vehicle were transported to the Channahon police department. About 35 minutes elapsed from the time defendant was pulled over and the time he arrived at the Channahon police department.

¶ 24        According to Coppolillo's police report, Degraff redeployed Rico to search defendant's vehicle at the Channahon police department at 8:44 p.m. Rico alerted at the backseat, and agents searched the vehicle. At this time, Coppolillo asked Inspector Tim Wherry and Trooper Diaz to interview defendant.

¶ 25        Wherry testified that he interviewed defendant at the Channahon police department. Although defendant said that he understood English, Wherry asked Diaz to translate. The officers asked defendant for consent to search the vehicle, and Diaz presented a Spanish side of

6

the consent to search form to defendant. Although Coppolillo's report stated that Rico was redeployed at 8:44 p.m., the form shows that defendant signed his consent at 8:50 p.m.

¶ 26    When the NARCINT agents searched defendant's vehicle, they found tubes wrapped with black tape from the vehicle's air filter. Inside the tubes was a substance that later tested positive for methamphetamines.

¶ 27    After hearing the parties' arguments, the trial court found the evidence showed that Korando properly stopped defendant for speeding. Degraff arrived at the scene while the stop was ongoing, and Rico alerted to narcotics. The trial court noted that Rico's certification had expired, but found that went to the weight of the evidence. The court also found that defendant consented to a search of his vehicle on I-80 and Korando notified Degraff of the consent. The court noted that no drugs were found during the first search and the vehicle was moved due to rain and safety issues. The court found, "I think moving the vehicle is proper under all the circumstances." The court concluded "I am not going to quash the drugs." However, the court quashed defendant's arrest on I-80 and suppressed statements defendant made as a result of the arrest. The written order granted defendant's motion to quash arrest and suppress statements, but denied defendant's motion to suppress the seizure of his vehicle and the evidence recovered during the search.

¶ 28    The cause proceeded to a bench trial where the evidence mirrored that adduced during the hearings on the motion *in limine* and motion to suppress. Ultimately, the court found defendant guilty, and sentenced defendant to 15 years' imprisonment.

¶ 29                                    ANALYSIS

¶ 30    On appeal, defendant argues that the trial court erred in partially denying his motion to suppress. Defendant argues that (1) the initial stop for speeding was unlawful, (2) the traffic stop

7

was unreasonably prolonged, and (3) the officers lacked probable cause to search his vehicle on I-80 and again at the Channahon police department. Upon review, we find that although the officers' testimony establishes that the order to stop defendant on the road was given prior to an observed traffic offense, he was speeding at the time he was actually pulled over and his detention was, therefore, supported by a lawful traffic stop. We also find that the free-air sniff did not unduly prolong the encounter because the dog was already near the scene of the orchestrated stop. Finally, we hold that any probable cause the officers might have developed during the course of the stop on I-80 dissipated when they failed to find any narcotics or hidden compartments during the first hand search of defendant's vehicle. Therefore, we hold that the search should have ended at this point and the officers acted improperly by relocating the vehicle to the Channahon police department for a second search.

¶ 31 We review the trial court's ruling on a motion to suppress evidence under a two-part test. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). The trial court's factual findings are entitled to deference and will be reversed only if they are against the manifest weight of the evidence. *Id.* The ultimate ruling of whether reasonable suspicion or probable cause exists and whether suppression is warranted is reviewed *de novo*. *Id.*

¶ 32 "[A] traffic stop is analogous to a *Terry* investigatory stop, and therefore, the reasonableness of police conduct during a traffic stop may be judged by reference to *Terry*'s 'dual inquiry.' " *Id.* at 238 (quoting *People v. Gonzalez*, 204 Ill. 2d 220, 228 (2003)). The two prongs of this inquiry are (1) whether the stop was justified at its inception and (2) whether the officer's actions during the course of the stop were reasonably related in scope to the circumstances that initially justified the stop. *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

¶ 33                    I. Was the Stop Justified at its Inception?

¶ 34          Defendant initially contends that the traffic stop was not justified at its inception. Because Korando testified that defendant was speeding when he pulled him over, we find the stop lawful.

¶ 35          Generally, stopping a vehicle based on a suspected violation of the law constitutes a seizure, even if the stop is for a brief period of time and for a limited purpose. *People v. Jones*, 215 Ill. 2d 261, 270 (2005) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)). For a traffic stop to comport with the reasonableness requirement of the constitutional guarantees, the officers must have at least " 'reasonable, articulable suspicion' " that a violation of traffic law has occurred. *People v. Hackett*, 2012 IL 111781, ¶ 20 (quoting *Gonzalez*, 204 Ill. 2d at 227). This means that officers must have "a particularized and objective basis for suspecting the particular person stopped" was violating a traffic law. (Internal quotation marks omitted.) *Prado Navarette v. California*, 572 U.S. ___, ___, 134 S. Ct. 1683, 1687 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). If reasonable suspicion is lacking, the traffic stop is unconstitutional and evidence obtained as a result of the stop is generally inadmissible. See *People v. Sutherland*, 223 Ill. 2d 187, 227 (2006).

¶ 36          Here, Korando testified that he had tested and verified that his LIDAR device was working properly at the start of his shift. The LIDAR device showed defendant was traveling seven miles per hour above the posted speed limit. Defendant, therefore, violated section 11-601(b) of the Illinois Vehicle Code (625 ILCS 5/11-601(b) (West 2012)). Korando's decision to stop defendant's vehicle was lawful at its inception.

¶ 37                    II. Did the Deployment of Rico Unreasonably Prolong the Stop?

¶ 38          Having found the initial stop of defendant's vehicle was proper due to the traffic violation, we must determine, under the second prong of *Terry*, whether the officers' conduct

impermissibly prolonged the duration of the detention or independently triggered the fourth amendment, thereby rendering the seizure unlawful. *Harris*, 228 Ill. 2d at 244. Defendant contends that the canine sniff impermissibly prolonged the traffic stop along I-80. Because the sniff occurred while Korando was still performing the duties related to the initial purpose of the stop, we find the sniff did not impermissibly prolong the encounter.

¶ 39        A suspicionless canine sniff conducted during a lawful traffic stop does not independently trigger the fourth amendment, so long as it does not unreasonably prolong the duration of the traffic stop. *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005). The duration of a traffic stop is analyzed under the totality of the circumstances approach, which considers the brevity of the stop and whether the police acted diligently during the stop. *People v. Baldwin*, 388 Ill. App. 3d 1028, 1032 (2009).

¶ 40        The tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, (*Caballes*, 543 U.S. at 407) and attend to related safety concerns (*Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1614 (2015)). Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Caballes*, 543 U.S. at 408. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. See *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979).

¶ 41        Here, Korando pulled defendant over for speeding. After obtaining defendant's information, Korando and defendant returned to Korando's squad car so that Korando could run the information through LEADS and write defendant a warning. Before Korando finished writing defendant a warning and receiving the confirmation from LEADS, Degraff arrived on the

10

scene and conducted the free-air sniff. After Rico alerted on the vehicle, Korando was informed by radio that defendant's LEADS check was clear. A free-air sniff conducted during a lawful traffic stop does not violate the fourth amendment, as long as it is done, as it was here, within the time reasonably required to complete the mission of the initial traffic stop. *Caballes*, 543 U.S. at 407.

¶ 42                    III. Did the Officers Have Probable Cause to Search Defendant's Vehicle?

¶ 43        Having found that the free-air sniff did not unreasonably prolong the traffic stop, we now consider whether Rico's alert constituted probable cause to search defendant's vehicle. Although we find that Rico's positive alert provided the officers with probable cause to search defendant's vehicle on I-80, we find that such probable cause dissipated after the officers' initial 15 minute hand search of the vehicle did not reveal any evidence of narcotics or any evidence of a hidden compartment within the vehicle. Therefore, we hold that the officers improperly transported defendant's vehicle to the Channahon police department for a second search.

¶ 44        The fourth amendment to the United States Constitution protects against unreasonable searches and seizures without a warrant. *People v. James*, 163 Ill. 2d 302, 311 (1994) (citing U.S. Const., amend. IV). The "automobile exception" is a recognized exception to the warrant requirement. (Internal quotation marks omitted.) *People v. Contreras*, 2014 IL App (1st) 131889, ¶ 28. Under this exception, a police officer may, during a valid traffic stop, search a vehicle without a warrant if probable cause has developed to believe the vehicle contains evidence of criminal activity, such as contraband. *Id.* Generally, stopping an automobile for a minor traffic violation does not justify a search of the detainee's person or vehicle; instead, the officer must reasonably believe he is confronting a situation more serious than a routine traffic violation. *Jones*, 215 Ill. 2d at 271. The reasonableness of an officer's conduct must be judged based on his

11

responsibility to prevent crime and apprehend criminals. *People v. Stout*, 106 Ill. 2d 77, 86-87 (1985). After an officer is in possession of facts sufficient to support probable cause to believe that a vehicle contains contraband, the vehicle may be searched without a warrant and the search area includes any interior compartment of the vehicle that might reasonably contain the contraband. *People v. DeLuna*, 334 Ill. App. 3d 1, 17 (2002); see also *United States v. Ross*, 456 U.S. 798, 806 (1982); *United States v. Johns*, 469 U.S. 478, 484 (1985).

¶ 45    "The probable-cause standard is incapable of [a] precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983), and *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). The existence of probable cause depends upon the totality of the circumstances at the time of the arrest. *People v. Love*, 199 Ill. 2d 269, 279 (2002). In reviewing whether probable cause for a search existed, a court examines the events leading up to the search or seizure viewed from the standpoint of an objectively reasonable law enforcement officer. *Jones*, 215 Ill. 2d at 274.

¶ 46    Although the parties devote a significant portion of their briefs to discussing what information the officers had regarding the prior drug transaction and the description of defendant and his vehicle, the evidence adduced at the hearing on the motion to suppress demonstrates probable cause existed to search the vehicle along I-80 based on Rico's positive alert to the presence of narcotics in defendant's vehicle. A positive alert to the presence of narcotics by a dog trained in the detection of narcotics is a permissible method of establishing probable cause. *People v. Campbell*, 67 Ill. 2d 308, 315-16 (1977). Thus, Rico's positive alert on the vehicle established probable cause to search the vehicle along I-80, unless Rico was shown to be unreliable.

¶ 47    Defendant attempts to defeat this probable cause showing by arguing that Rico was not sufficiently reliable in the area of narcotics detection. Specifically, defendant alleges that because Rico's certification had expired a month before the time of the sniff, the State was required (and failed) to establish Rico's accuracy and reliability. We disagree.

¶ 48    The United States Supreme Court has articulated the test to determine "if the 'alert' of a drug-detection dog during a traffic stop provides probable cause to search a vehicle." *Florida v. Harris*, 568 U.S. 237, 240 (2013). This approach employs a " 'flexible, common-sense standard' of probable cause." *Id.* (quoting *Gates*, 462 U.S. at 239). In employing this standard, the *Harris* Court noted:

> "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Id.* at 246-47.

¶ 49    Here, Degraff testified that he had training in canine recognition of narcotics and in narcotics interdiction. Degraff and Rico had been partnered since February 2012. Rico trained at the Illinois State Police Academy from February through May 2012, to detect the odor of narcotics. Rico was certified by the Illinois State Police as a narcotics investigation canine in May 2012. The certification alone allows the court to "presume" (*id.*) that the dog was sufficiently reliable and protects against any subsequent holding that the trial court's determination of reliability is manifestly erroneous.

¶ 50    Moreover, even though Rico's certification had expired at the time of the sniff, the State adduced additional evidence from Degraff regarding Rico's reliability. Although Rico was out of service for a three-month period due to a broken leg, Degraff stated that he and Rico otherwise trained twice a month for 10 hours each day at different locations in different environments. Degraff explained that Rico gives an "unknown response" every third or fourth training day. However, each "unknown response" was later explained by either a residual odor or a trainer handling narcotics and touching something in the training area. Degraff keeps computer logs of the training. Rico participated in about 50 "real world" narcotics investigations. Degraff did not keep records on Rico's accuracy in the field, but Degraff indicated that Rico never alerted to a training blank (a room or vehicle that has never contained drugs). Based on the totality of the evidence, the State established that Rico was reliable in determining that contraband was or at some time had been present in defendant's car or on his person.

¶ 51    Having found that Rico was reliable and officers had probable cause to search defendant's vehicle on I-80, we now consider whether the officers had probable cause to transport the vehicle to the Channahon police department for a second search. Because the initial hand search revealed neither narcotics nor any evidence of a hidden compartment within the vehicle, we conclude that the officers lacked probable cause to relocate the vehicle for a second search.

¶ 52    The fourth amendment requires that a search not continue longer than necessary to effectuate the purposes of an investigative stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality op.). More specifically, an investigative stop must cease once reasonable suspicion or probable cause dissipates. See *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993); *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (unlawful for police to execute search after

14

they learn that probable cause no longer exists). Probable cause to search a vehicle does not "dissipate" simply because it takes a long time to complete a reasonable and thorough search of the vehicle. *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) (affirming denial of motion to suppress when there was evidence of hidden compartments in the vehicle and it took six hours to locate drugs during examination of the vehicle in the highway patrol garage).

¶ 53    In the present case, Korando and Degraff searched the entire vehicle on I-80 and failed to find any contraband. More significantly, the State failed to produce any evidence that Korando or Degraff observed any indication that the vehicle may have had a hidden compartment that would justify moving the vehicle to the Channahon police department for a second search. The mere fact that Degraff believed the vehicle may have contained a hidden compartment is insufficient to establish probable cause, as Degraff offered no evidence to support his belief. *Terry*, 392 U.S. at 22 (intrusions upon constitutionally guaranteed rights must be based on more than inarticulate hunches). There is also no evidence from the controlled exchange between defendant and Gutierrez to suggest that the vehicle contained a hidden compartment. Although the hood of the minivan was up and defendant was standing at the front of the vehicle during the controlled exchange, Gutierrez never testified that he saw defendant remove the tube of narcotics from the vehicle. Thus, when the initial search of the vehicle on I-80 was fruitless, any probable cause dissipated and the officers no longer had any authority to continue their search. This conclusion remains true even though Coppolillo testified that moving the vehicle was due to weather conditions and officer safety. Critically, Coppolillo made this decision *after* Korando and Degraff had completed their initial hand search.

¶ 54    In reaching this conclusion, we reject the State's argument that probable cause was not necessary to perform the first search or move the vehicle to the Channahon police department for

15

a second search. Specifically, the State argues that defendant consented to the search both at the scene and again at the Channahon police department. Thus, the State asserts that probable cause was unnecessary to justify the search. We discuss each search in turn.

¶ 55    As to defendant's consent to search on I-80, it is well settled that an individual may consent to a search conducted without a warrant, thereby eliminating the need for probable cause and a search warrant. *People v. Ledesma*, 206 Ill. 2d 571, 592 (2003), *overruled on other grounds by People v. Pitman*, 211 Ill. 2d 502, 513 (2004). However, "[w]hen the police rely upon consent as the basis for a warrantless search, they have no more authority than they have apparently been given by the voluntary consent of the defendant." *People v. Baltazar*, 295 Ill. App. 3d 146, 149 (1998).

¶ 56    The standard for measuring the scope of a suspect's consent is that of " 'objective' reasonableness," which requires consideration of what a "typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); see also *Ledesma*, 206 Ill. 2d at 593; *People v. Vasquez*, 388 Ill. App. 3d 532, 553 (2009); *Baltazar*, 295 Ill. App. 3d at 149-50. The scope of a search is defined by its expressed object or purpose. *Jimeno*, 500 U.S. at 251; *Ledesma*, 206 Ill. 2d at 593. "By indicating to the suspect the intended object of the search either directly or by revealing a suspicion of specific criminal activity, a police officer not only 'apprises the suspect that his constitutional rights are being impacted, but he also informs the suspect of the reasonable parameters of his inquiry.' " *Ledesma*, 206 Ill. 2d at 593 (quoting *Baltazar*, 295 Ill. App. 3d at 150).

¶ 57    In the present case, Korando asked defendant on I-80, "can we search your vehicle to make sure there's nothing in there that's not supposed to be, there's nothing illegal?" and

16

defendant allegedly replied "yes." Assuming defendant did in fact respond in the affirmative, the reasonable inference is that his consent was limited to a search of his vehicle at the site of the stop on I-80. Thus, a reasonable person in defendant's position would have understood that he had authorized Korando to search his entire vehicle while it was stopped on I-80. In other words, it is unreasonable to believe that when defendant gave his consent, he also consented to the relocation of his vehicle for an even more invasive search. Stated another way, we do not believe an Illinois citizen who is pulled over on a highway and subsequently consents to a search of his vehicle intends to voluntarily and knowingly consent to have his vehicle removed from the highway and relocated to the local police station for a further search once the initial search on the highway is completed. The officers' decision to relocate defendant's vehicle in the instant case exceeded the scope of defendant's alleged consent along I-80.

¶ 58        As to defendant's purported consent to search at the Channahon police department, "consent is ineffective to justify a search when a search or entry made pursuant to consent immediately following an illegal search, involving an improper assertion of authority, is inextricably bound up with illegal conduct and cannot be segregated therefrom." *People v. Kelly*, 76 Ill. App. 3d 80, 86 (1979); see also *People v. Gherna*, 203 Ill. 2d 165, 186-87 (2003). The officers engaged in impermissible conduct when they seized defendant's vehicle without probable cause and transported it to the Channahon police department for a more prolonged and invasive search. It is of no consequence that defendant later "consented" to the second search as the second search was inextricably bound with the illegal conduct of the officers. We therefore conclude that defendant's "consent" (being the fruit of an illegal assertion of authority) cannot justify a further illegal search. Consequently, the second search pursuant to the traffic stop

17

performed by the officers at the Channahon police department lacked probable cause and cannot be justified by defendant's later consent.

¶ 59   In its brief and at oral argument, the State asserted that the probable cause for the supplemental search in Channahon was that flowing from the prior money-less drug transaction between defendant and undercover officers six days earlier. The proper response to that claimed probable cause was to use the ensuing six days either to complete the drug investigation with an actual transaction or to apply for a warrant to search defendant's car. It was not authorization to orchestrate a traffic stop to enable a warrantless search.

¶ 60                                                    CONCLUSION

¶ 61   For the foregoing reasons, we reverse defendant's conviction on the grounds that the trial court erred in partially denying defendant's motion to suppress. Because the conviction cannot stand in the absence of any narcotics, we remand the matter to the trial court with directions to vacate defendant's conviction and sentence and for any further proceedings necessary. See *People v. Surles*, 2011 IL App (1st) 100068, ¶ 42. In light of the fact that we are reversing defendant's conviction and sentence, we need not reach the remaining issues on appeal.

¶ 62   Reversed and remanded with directions.