2020 IL App (1st) 163179-U

FOURTH DIVISION
April 23, 2020

No. 1-16-3179

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 16287 |
| | ) | |
| LAMAR WHATLEY, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) The State proved defendant guilty beyond a reasonable doubt; (2) the trial court did not err in denying defendant's motion to suppress evidence; (3) the trial court did not err in allowing the State to introduce the prior inconsistent statement of a witness; and (4) defendant's sentence does not violate the proportionate penalties clause of the Illinois Constitution.

¶ 2    Following a jury trial, defendant Lamar Whatley was convicted of two counts of attempted first degree murder during which he personally discharged a firearm that proximately caused great bodily harm and two counts of aggravated battery for discharging a firearm that caused injury related to the August 21, 2014, shootings of Dana Harvey and Jarrod Wright. Defendant was also

convicted of one count of unlawful use of a weapon by a felon (UUWF) at a simultaneously held bench trial. The trial court subsequently sentenced defendant to consecutive terms of 33 years in prison, for an aggregate term of 66 years.

¶ 3     Defendant appeals, arguing that (1) the State failed to prove defendant guilty of armed robbery beyond a reasonable doubt because the State failed to prove he acted with requisite intent to kill either Harvey or Wright; (2) the trial court erred by denying defendant's motion to suppress where the State failed to establish that the warrantless search of defendant's car was lawful; (3) the trial court erred in allowing the State to introduce a portion of Nakia Wright's prior videotaped statement which was not inconsistent with her trial testimony; and (4) defendant's 66-year sentence is unconstitutional as applied to him because under the mandatory sentencing statutes, defendant's sentence amounts to a *de facto* natural life sentence.

¶ 4                                    I. BACKGROUND

¶ 5     In September 2014, defendant was charged by indictment with several criminal offenses, including the attempted first degree murders of Dana Harvey and Jarrod Wright during which defendant personally discharged a firearm that proximately caused great bodily harm to each of the victims, the aggravated battery of Harvey and Wright, and UUWF.

¶ 6     Prior to trial, defendant filed a motion to quash arrest and suppress evidence. On September 13, 2016, the trial court conducted a hearing on defendant's motion. At the start of the hearing, the following colloquy took place between the court and the parties:

> "TRIAL COURT: This is a motion to quash arrest, is that right, and suppress
>
> physical evidence?
>
> DEFENSE COUNSEL: Yes.
>
> PROSECUTOR: Suppress the evidence.

DEFENSE COUNSEL: Suppress the evidence.

PROSECUTOR: Not to quash the arrest.

DEFENSE COUNSEL: No, no, just suppress the evidence, Judge. Specifically the gun.

TRIAL COURT: I'm a little confused here. A gun is found underneath the car. Are you contesting the basis of the stop?

DEFENSE COUNSEL: The search, Judge. The gun is found in the engine of the car, in the front of the car inside the engine. The car is searched and a gun is found."

¶ 7     Detective Reggie Cotton testified that he was employed by the Hazel Crest Police Department. On August 21, 2014, he was working with his partner, Officer Derrick Chambliss, when they received a phone call from Chicago police regarding a drive-by shooting. The officers were given information which included defendant's name, address in Hazel Crest, and make and model of his vehicle, a Ford Thunderbird. At approximately 10:30 p.m. that night, the officers arrived at 16827 South Head Avenue and observed an individual in a vehicle. Detective Cotton identified defendant in court as the person he observed that night. He approached defendant and identified him as the individual sought for the shooting in Chicago. Detective Cotton was not involved in the incident in Chicago and had no independent knowledge of the incident. Detective Cotton asked defendant to exit the vehicle and then he placed defendant in handcuffs and held him in the patrol vehicle.

¶ 8     Detective Cotton testified that Chicago police officers arrived at the location soon after and estimated they arrived in approximately five minutes. When the Chicago police officers arrived at the location, defendant was transferred into their custody, but defendant remained in the Hazel

Crest police car. Officers from Chicago and Hazel Crest then searched defendant's vehicle. Detective Cotton searched the front driver's side. The detective did not have a search warrant, nor had defendant given his permission for the search. Detective Cotton did not have an arrest warrant for defendant. He had not seen defendant break the law and the car was parked legally. A gun was found by one of the Chicago police officers and inventoried by the Chicago police. Defendant's vehicle was subsequently towed by Chicago police. Detective Cotton did not call for a tow or complete a tow report. He did not know which Chicago officer completed a tow report. He "guessed" that the car was searched before a tow was called because a tow truck was not on the scene.

¶ 9 Officer John Burke testified that he was employed by the Chicago Police Department and on August 21, 2014, he learned that defendant had been identified as the offender in a shooting in Chicago and he had been given an address in Hazel Crest. He arrived at the Hazel Crest location at around 10:30 or 11 p.m. Officer Burke identified defendant in court as a person he observed that night. Office Burke was the passenger in the police vehicle. His partner parked their car behind the Hazel Crest police vehicle and they approached the Hazel Crest police officers.

¶ 10 Within approximately 10 to 15 minutes, the officers at that location began a search of defendant's vehicle. Officer Burke searched at the hood of the car with a flashlight. He did not know if another officer asked defendant for permission to search. He did not have a search warrant and did not know if a consent to search form had been completed. Defendant's car was legally parked on the street. A gun was recovered in the engine compartment, behind the headlights on the left. After the gun was found, an evidence technician was called to the location to recover the gun. Officer Burke testified that the search was occurring as an inventory search prior to being towed. Officer Burke stated that it was police policy to conduct an inventory search to locate

personal items that need to be inventoried and to find any dangerous weapons. The search took place before the tow truck was called. Officer Burke had no independent knowledge of the shooting that occurred in Chicago. Officer Burke also stated that the search occurred because defendant was a suspect in a crime and the shooting had occurred within an hour of his arrival at the address in Hazel Crest. The police computer included details of the shooting, including defendant's vehicle with the license plate and description.

¶ 11    Following arguments, the trial court denied defendant's motion to suppress evidence. The court made the following findings:

> "The Court will make the following findings of fact and conclusions of law.
>
> I think there's two bases that I need to examine whether or not the search was, in fact, justified.
>
> Number 1. Whether or not there's sufficient probable cause to search the vehicle.
>
> There's testimony from this officer that the particular car that was described with the license plate was found in the location in Hazel Crest where the defendant was. The defendant was, in fact, apparently wanted for a shooting. This is not something that occurred several days before. It occurred within the hour before. Since the information that the officers had, obviously knowledge imputed from one officer is imputed to another. Knowledge known from one officer is imputed to other officers. I believe there's sufficient probable cause because of the close period in time from the date of the – from the occurrence to the time of the stop, that the police officers had probable cause to search that vehicle specifically for a weapon.

The alternate theory is this is an inventory search, and I believe that that is, in fact, justified also.

The officers testified that they were going to tow the car for further investigation in this matter. Pursuant to towing the car I do believe they do have a right to inventory the contents, number one, to protect the defendant from any type of theft that could be taken from the car and also to protect the officers from any type of allegation that the officers did something to the car or took any items from the car or subsequently placed any items in the car.

If it was just an arrest where they were going to lock up the car and leave it on the scene, obviously I would not rule the same way with regard to the inventory search. But since the car was going to be towed, I believe the officers did have the right to go into the car and inventory the items inside the car.

In any event, I believe the weapon found was, in fact, pursuant to probable cause or in the alternative theory pursuant to an individual [*sic*] search."

¶ 12    Following the denial of the defense Motion to Quash, the case proceeded to trial in October 2016.

¶ 13    Nakia Wright testified that in August 2014, she lived at 6958 South Throop Street in Chicago. Defendant was her boyfriend and they had been in a relationship for about eight years. Defendant owned a silver Thunderbird.

¶ 14    On August 21, 2014, there was a party outside her home for a friend's birthday. People were playing cards and drinking. Dana Harvey, a friend for over 20 years, and Jarrod Wright, her cousin, were guests at the party. Nakia stayed inside her house during the party. Defendant came over later that night and came inside the house. Nakia and defendant were talking in her room for

a couple of hours. At some point, defendant decided to leave and asked if Nakia would go with him, but she declined. She did not want to ride in defendant's car because it did not have air conditioning and it was hot. Defendant wanted her to go with him. Nakia testified that they "played the mad role all the time with each other." When asked if she and defendant were mad at each other, Nakia responded: "No, he wasn't that mad like that at me. He asked, you know, like, he waste [*sic*] gas coming down there, you know, because he coming [*sic*] to get me." Defendant then said he was leaving. Nakia stayed in her room and defendant left.

¶ 15    Nakia testified that defendant did not attend the party outside. She estimated that it was 8 or 9 p.m. when defendant left, but she did not remember. She stated that it was dark. About five to ten minutes after defendant left, people came into her room and she called 911. Police arrived at the house later that evening.

¶ 16    The following day, on August 22, 2014, Nakia was interviewed at the police station by two detectives. She also agreed to speak with an assistant State's Attorney (ASA) and consented to a videotaped interview. Nakia was asked at trial about an exchange during the videotaped interview where she was asked if defendant was mad when he left her house, and she had responded in the affirmative. She answered at trial, "I guess. Yeah, I guess. I mean, he wasn't mad like that mad mad, you know." When asked again if she gave that answer, Nakia answered, "Maybe I did."

¶ 17    On cross-examination, Nakia was asked if she and defendant "had maybe a lit[tle] spat or something," and she answered, "Yes." She did not hear a commotion or see what had happened, but five to ten minutes later, people came into the house.

¶ 18    The State impeached Nakia with a portion of her videotaped statement to the ASA, over defendant's objection. In the excerpt, the ASA asked if defendant was mad when he left, and Nakia responded, "Yeah."

¶ 19    Dana Harvey testified that he lived at 6949 South Throop Street, and had lived there almost his whole life. On August 21, 2014, he was in the area all day for a friend's birthday party. The party was in front of Nakia's house, which was across the street from his house. He estimated there were five to ten people at the party. Jarrod Wright was also at the party. Harvey had known Wright all of his life. Harvey knew defendant as Nakia's boyfriend and identified him in court. Harvey did not see Nakia at the party, she was in the house.

¶ 20    At approximately 9 p.m., Harvey was near the corner of West 70th Street and South Throop Street. He "heard someone arguing or saying something," and then he looked and saw someone pointing a gun. He did not see who was arguing. He saw the person point a gun from inside a tan Thunderbird. He had seen that car before and knew it belonged to defendant. On that date, Harvey did not see defendant in the car. The hand holding the gun was extended from the driver's side window. Harvey was about five to ten feet from the car. Harvey "got a glimpse" of the driver, but "[i]t wasn't a real good look at his face." Harvey denied recognizing defendant as the driver of the Thunderbird.

¶ 21    The person with the gun pointed it toward the crowd of partygoers and pulled the trigger. Harvey heard the gun make a clicking sound "once or twice" and no bullets were fired. Then the gun fired "three to six, maybe five" bullets. Harvey was then struck in his left shoulder with one of the bullets. He then laid down on the sidewalk. While on the ground, he saw that Wright and another man had also been shot.

¶ 22    Harvey was taken to Stroger Hospital and treated. He did not have surgery to remove the bullet because removal would have caused more damage. The bullet was still in his arm. While at the hospital, Harvey spoke with police detectives. He admitted that he told the police that he had observed defendant drive eastbound in a tan Thunderbird and pass him. Harvey then told the police

that defendant stopped the car on the east side of 70th Street and Throop Street and pointed a gun out of the driver's side window and pulled the trigger. Harvey was released from the hospital that night.

¶ 23    The following day, on August 22, 2014, Harvey went to the police station and agreed to give a videotaped statement to the ASA. He admitted that he told the ASA that defendant was the driver, but he stated at trial that someone told him that defendant shot him. He also admitted that he told the ASA that he saw defendant point the gun out of the window and "brandished a firearm."

¶ 24    On cross-examination, Harvey testified that he had been drinking cognac and smoking marijuana throughout the day, beginning around 3 p.m. He also stated that he had been given the prescription pain medication Norco at the hospital after the shooting. According to Harvey, he agreed to speak with the police at the hospital, but he did not want to speak with them. He said he initially told them that he did not know who shot him, but the police kept asking for a name and he told them defendant's name because that was the name he had heard. He denied that the police told him defendant's name. On redirect, Harvey said that the police questioned him a couple of hours after the shooting and he had not consumed any more alcohol or smoked marijuana since the shooting. Harvey admitted that during his interview with the ASA, he denied being under the influence of any drugs or alcohol.

¶ 25    The State introduced Harvey's videotaped statement to the ASA as substantive evidence over defendant's objection. In the videotaped statement, Harvey stated he was outside Nakia's house for between two and four hours. He did not see any arguments or fights, everyone was socializing. He did not see anyone leave the home, but right before the shooting he saw someone drive away. Harvey said the shooting occurred around 9:30 p.m. He observed a tan Thunderbird pull out on 70th Street and driving east on 70th. He knew defendant drove a tan Thunderbird and

that he was Nakia's boyfriend. Harvey was at the corner of 70th and Throop when the tan Thunderbird drove by and he identified defendant as the driver. He estimated he was around five feet away when he first saw him. Harvey heard someone yell something in the direction of the Thunderbird. The car then stopped and Harvey saw defendant point a firearm out of the window. Defendant then pulled the trigger two or three times and it clicked with no bullets discharged. Defendant continued to pull the trigger and "four or five shots came out." Harvey estimated that he was about 10 to 15 feet away when defendant started firing the gun. Harvey was hit in his left shoulder. He laid on the ground and waited for paramedics. Harvey did not see defendant in a dispute with anyone that day and he did not have any issue with defendant.

¶ 26 Jarrod Wright testified about attending the party at Nakia's house on August 21, 2014. The family gathering started around 4 p.m. Wright did not see defendant that day. He was outside playing cards at the party just before 9:30 p.m. While he was playing, he heard gunshots and "took off running." Wright was outside in front of the house at the time of the shooting. Wright was struck in his side by a gunshot. He was facing the house when he was shot, the gunshots came from outside. When he was shot, Wright ran to the porch and laid down. He heard five to six gunshots. He did not hear anything or see anyone fighting before the gunshots.

¶ 27 Wright was subsequently taken to Christ Hospital by ambulance. He underwent surgery and had his spleen removed. Wright testified that he did not know who shot him. The following day, on August 22, 2014, detectives and an ASA came to the hospital to interview him. Wright denied that he had agreed to give a handwritten statement to the ASA. Wright testified that he could "barely remember anything from that day" and was "under morphine." When asked if the ASA asked Wright to sign his statement, Wright stated that he was told he was signing medical papers by the nurse. He admitted to telling the ASA several personal details, including his date of

birth, education, and employment. He also admitted that he told the ASA that he attended the party on August 21, 2014, with a description of the location. He denied telling the ASA that he noticed a Thunderbird parked on 70th Street near the party and that sometime after 9 p.m., he saw defendant drive the Thunderbird away from that location. He also denied telling the ASA that he had seen defendant a number of times over the previous five years and had seen defendant drive a Thunderbird. Wright denied telling the ASA that five minutes after he saw defendant drive away, defendant pulled up at the intersection of 70th and Throop and that he was able to see defendant because of the streetlights near the intersection. He admitted to signing a photograph of defendant, but he testified that he was only asked if he knew defendant and Wright answered that he did. Wright continued to deny giving a statement to the ASA. He denied that he read a paragraph out loud to show that he could read English because he "had tubes in [his] throat, tubes in [his] nose" and he was not able to "speak or read out anything." Wright acknowledged that his signature was on each page of the statement as well as his initials were next to each correction, but he stated that he thought he was signing medical papers.

¶ 28    The State later introduced Wright's handwritten statement during the testimony of ASA Patrick Turnock. In the statement, Wright stated that while at the party he noticed a Thunderbird parked on 70th Street, near 6958 South Throop Street. Sometime after 9 p.m., Wright saw the Thunderbird drive away with defendant driving. Wright knew defendant because defendant was dating Wright's cousin Nakia. He has seen defendant a number of times over the last five years and had seen defendant drive a Thunderbird. Wright had not seen defendant the night of the party before he saw defendant drive away. About five minutes later, Wright saw defendant pull up to the intersection of 70th Street and Throop Street, going east on 70th. He was able to see defendant from the streetlights. Wright then turned to walk into the house when he heard gunfire. He felt a

pain in his side and realized he had been shot. He never saw anyone arguing or fighting with defendant. Wright also stated that he was receiving morphine for pain, but was able to understand ASA Turnock and was able to think clearly. ASA Turnock testified that Wright was alert and agreed to give the statement. He stated that Wright did not have any tubes in his throat at the time of the interview.

¶ 29 Officer Derrick Chambliss of the Hazel Crest Police Department testified that he was working with Officer Cotton on August 21, 2014, when they received a call for assistance from the Chicago Police Department sometime between 10 and 10:20 p.m. As a result of the call, the officers proceeded to 16827 Head Avenue in Hazel Crest and looked for a tan Thunderbird. The vehicle was parked on the street and defendant was seated in the driver's seat. The officers then placed defendant in handcuffs and notified the Chicago Police Department. Chicago police officers arrived at the location shortly thereafter. Chicago officers identified defendant and began to search the Thunderbird. During the search, a revolver handgun was found in the engine compartment.

¶ 30 Officer John Burke of the Chicago Police Department testified that on August 21, 2014, he was on patrol with two partners when one of his partners received a call from their sergeant about a shooting that had occurred at 6958 South Throop Street. Officer Burke then pulled up the information about the shooting on his computer, which included an offender and vehicle information. The officers then drove to 16827 Head Avenue in Hazel Crest. When they arrived, Officers Chambliss and Cotton already had defendant in custody. The officers then searched the tan Thunderbird parked at that location. During the search, Officer Burke found a revolver in the engine compartment. An evidence technician was then called to recover the firearm.

¶ 31 Ellen Chapman testified as an expert in the field of trace evidence regarding gunshot residue. She was employed as a forensic scientist in trace evidence at the Illinois State Police

Forensic Science Center. Chapman tested a gunshot residue sample taken from defendant's hands and the result was negative. She explained that gunshot residue consists of three particles. To yield a positive result, she required the presence of three particles, but only one particle was found in defendant's sample. She further explained that gunshot residue can be removed through normal activity, including washing or wiping hands.

¶ 32    Detective Donna Walsh testified that she and her partner interviewed Harvey in the emergency room of Stroger Hospital the night of August 21, 2014, at around midnight. Harvey told her that he was standing in front of Nakia's house when he observed defendant drive eastbound on 70th Street. Defendant then "stopped, looped back, pointed a gun out the window" and then Harvey heard three or four clicking sounds before he was shot. During the interview, Harvey did not tell the detective that someone told him who the shooter was that night. Detective Walsh also testified that Harvey appeared cogent and she did not have any problem understanding him. She did not have to ask him the same question multiple times.

¶ 33    The parties stipulated that Phillip Rider, an evidence technician with the Chicago Police Department, would testify that he came to the location in Hazel Crest and recovered a revolver from the engine compartment of defendant's Thunderbird. The parties also stipulated that the revolver contained four spent shells and the remaining bullet chambers were empty. The parties further stipulated that no fingerprints or DNA suitable for comparison were recovered from the revolver.

¶ 34    The State then rested. Defendant moved for a directed verdict in the jury case and a directed finding in the bench trial, both of which the trial court denied. Defendant then rested his case without presenting any additional evidence. Following deliberations, the jury found defendant guilty of the attempted first degree murder of Harvey and Wright and found that defendant

personally discharged a firearm that proximately caused great bodily injury to Harvey and Wright. The jury also found defendant guilty of two counts of aggravated battery. The trial court found defendant guilty of UUWF. At the subsequent sentencing hearing, the trial court sentenced defendant to consecutive terms of 33 years for each of the attempted first degree murder convictions, for a total of 66 years.

¶ 35    This appeal followed.

¶ 36                                II. ANALYSIS

¶ 37    Defendant first argues that the State failed to prove him guilty beyond a reasonable doubt because the evidence was insufficient to establish that he acted with the specific intent to kill either Harvey or Wright. The State maintains that the evidence was more than sufficient to prove that defendant intended to kill both Harvey and Wright.

¶ 38    When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). "Accordingly, a jury's findings concerning credibility are entitled to great weight." *Id.*

¶ 39    The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Id*. Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. *Hall*, 194 Ill. 2d at 330.

¶ 40    To support a conviction for attempted murder, the State must establish beyond a reasonable doubt that: (1) the defendant performed an act constituting a substantial step toward the commission of murder, and (2) the defendant possessed the criminal intent to kill the victim. 720 ILCS 5/8-4(a), 9-1 (West 2012); *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39. "Proof of a specific intent to kill is a necessary element of the offense." *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41.

¶ 41    " ' "Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred. [Citations.] Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life." ' " *Petermon*, 2014 IL App (1st) 113536, ¶ 39 (quoting *People v. Green*, 339 Ill. App. 3d 443, 451 (2003), quoting *People v. Winters*, 151 Ill. App. 3d 402, 405 (1986)). "Generally, the act of firing a gun, with nothing more, is not sufficient to prove intent to kill." *Id*. However, an intent to kill may be proven where the surrounding circumstances established that the defendant fired a gun at or towards another person with either malice or a total disregard for human life. *Id*. This court has found that "[t]he very act of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." *People*

*v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). Courts have also considered the number of shots, range, and the general target area in assessing intent. *People v. Bryant*, 123 Ill. App. 3d 266, 274 (1984). "The jury is tasked with determining whether a specific intent to kill exists, and its conclusion will not be disturbed absent reasonable doubt as to the defendant's guilt." *Vega*, 2018 IL App (1st) 160619, ¶ 41.

¶ 42    After viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have concluded that defendant intended to kill Harvey and Wright. The evidence introduced at trial established that defendant had a disagreement with his girlfriend Nakia, left her home, and entered his vehicle, a Thunderbird, on 70th Street. He then pulled away eastbound. At the same time, a party with several attendees was taking place in front of Nakia's home at the corner of 70th Street and Throop Street. Defendant pulled to the intersection and fired his revolver at least seven times. The first couple pulls of the trigger did not release any bullets, but defendant continued to pull the trigger in the direction of the partygoers. He struck three men, including Harvey and Wright. He then left the scene. While Harvey and Wright both asserted at trial that they did not see the shooter, their initial statements to the police and the ASA clearly identified defendant, who was known to them as Nakia's boyfriend who drove a Thunderbird. Harvey identified defendant as the shooter in a videotaped statement. Wright gave a signed handwritten statement to the ASA in which he also identified defendant as driving a Thunderbird immediately preceding the shooting. This evidence showed that defendant fired a gun toward a group of individuals with a total disregard for human life.

¶ 43    We are not persuaded by defendant's arguments that this evidence was not sufficient to prove an intent to kill because he did not make any statements, such as threats, prior to the shooting, nor did the State establish a motive for shooting the partygoers. This court has previously held that

the State is not required to show motive to sustain a conviction for attempted murder. *People v. Furdge*, 332 Ill. App. 3d 1019, 1023 (2002); see also *People v. Huckstead*, 91 Ill. 2d 536, 548 (1982). We also reject defendant's contention that the evidence did not show that he had an intended target and that the shots may have been intended to frighten the partygoers. However, these arguments only relate to the weight of the evidence and the inferences to be drawn therefrom. " 'The decision as to which of competing inferences to draw from the evidence is the responsibility of the trier of fact.' " *People v. Peters*, 2018 IL App (2d) 150650, ¶ 19 (quoting *People v. Green*, 339 Ill. App. 3d 443, 451-52 (2003)). Where the jury was presented with the all the testimony, including any contradictions or inconsistencies, we cannot say the evidence was so improbable or unsatisfactory such that there is a reasonable doubt as to defendant's guilt.

¶ 44 Next, defendant asserts that the trial court erred in denying his motion to suppress the gun recovered from his vehicle. Specifically, defendant contends that the State failed to meet its burden at the suppression hearing that the search of the vehicle was lawful because it was either (1) supported by probable cause; (2) a proper search incident to a lawful arrest; and (3) a proper inventory search. The State maintains that the search of defendant's car was lawful under multiple theories.

¶ 45 "When reviewing the trial court's ruling on a motion to quash arrest and suppress evidence, we apply a two-part standard of review." *People v. Almond*, 2015 IL 113817, ¶ 55. We afford great deference to the trial court's findings of fact and will reverse those factual findings only if they are against the manifest weight of the evidence, but review the ultimate legal ruling as to whether the evidence should be suppressed *de novo*. *Id.* "Further, the reviewing court may consider evidence adduced at trial as well as at the suppression hearing." *People v. Richardson*, 234 Ill. 2d 233, 252 (2009).

¶ 46    When a defendant files a motion to suppress evidence, he bears the burden of proof at a hearing on that motion. *People v. Gipson*, 203 Ill. 2d 298, 306 (2003); 725 ILCS 5/114-12(b) (West 2016) ("The judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were unlawful shall be on the defendant."). A defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure, and, once a *prima facie* case is established, the burden shifts to the State to present evidence to counter the defendant's prima facie case. *Id.* at 306-07. However, the ultimate burden of proof remains with the defendant. *Id*.

¶ 47    "Both the fourth amendment and the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures." *People v. Colyar*, 2013 IL 111835, ¶ 31 (citing U.S. Const., amend. IV and Ill. Const. 1970, art. I, § 6). "This court has explained that '[t]he "essential purpose" of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions.' " *Id.* (quoting *People v. McDonough*, 239 Ill. 2d 260, 266 (2010), quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

¶ 48    Initially, the State argues that defendant waived any argument on appeal that his arrest lacked probable cause because defense counsel explicitly informed the trial court that he was only contesting the search of the vehicle, not the arrest. When asked by the trial court if defendant was "contesting the basis of the stop," defense counsel responded, "The search, Judge. The gun is found in the engine of the car, in the front of the car inside the engine. The car is searched and a gun is

found." Defense counsel's opening statement and closing argument did not challenge probable cause for defendant's arrest. Rather, counsel argued that since the car was "locked and secured," defendant was "in custody," and there was "no chance of any evidence that would spoil or would be compromised," the police had time to obtain a warrant to search the vehicle. Defendant contends that while trial counsel focused on the search of the vehicle, counsel did not concede the arrest was lawful. We disagree with defendant's contention where defense counsel explicitly stated at the hearing that he was only challenging the search and presented no argument regarding probable cause to arrest defendant. However, defendant argues in the alternative that if this court finds this argument was not sufficiently raised, then his trial counsel was ineffective for failing to challenge his arrest.

¶ 49    Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. "Under this test, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Henderson*, 2013 IL 114040, ¶ 11. "In recognition of the variety of factors that go into any determination of trial strategy, courts have held that such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002) (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000), and *Strickland*, 466 U.S. at 689). "With regard to the filing of a motion to suppress, the decision whether to file such a motion is generally 'a matter of trial strategy, which

is entitled to great deference.' " *People v. Gayden*, 2020 IL 123505, ¶ 28 (quoting *People v. White*, 221 Ill. 2d 1, 21 (2006)). Failure to establish either *Strickland* prong precludes a finding of ineffective assistance of counsel. *Henderson*, 2013 IL 114040, ¶ 11.

¶ 50    In *Henderson*, our supreme court described a variation of the prejudice standard to be applied when a claim of counsel's ineffectiveness stems from the failure to file a motion to suppress evidence. *Id.* ¶ 15. To show prejudice in that situation, the defendant must "demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Id*.

¶ 51    Here, while trial counsel filed a motion to suppress, defendant contends that he was ineffective for failing to challenge the probable cause for his arrest in the motion. Defendant asserts that both prongs have been satisfied in this case because "whether the police had probable cause was the key to whether the search of the car was unlawful." Defendant further contends the failure to raise probable cause for arrest was prejudicial because the State's evidence was insufficient to establish probable cause.

¶ 52    "[I]n deciding whether probable cause exists, a law enforcement officer may rely on training and experience to draw inferences and make deductions that might well elude an untrained person." *People v. Jones*, 215 Ill. 2d 261, 274 (2005).

> "Probable cause is a practical, nontechnical concept that deals with the factual and practical considerations of everyday life on which reasonable and prudent persons—not legal technicians—act. Probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts; it is not readily, or usefully, reduced to a neat set of legal rules. The substance of all of the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of

guilt must be particularized with respect to the person to be searched or seized." *Id*. (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

"A court must examine the events leading up to the search or seizure, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable law enforcement officer, amount to probable cause." *Id*. at 274-75.

¶ 53    In this case, the record provides sufficient evidence to support probable cause for the arrest. The shooting occurred at around 9:30 p.m. outside Nakia's residence at Throop Street and 70th Street in Chicago. Defendant and his tan Thunderbird were identified at the scene as the perpetrator by witnesses. Harvey identified defendant as the shooter in his videotaped statement and Wright identified defendant driving the Thunderbird immediately prior to the shooting. Defendant was known to both men as Nakia's boyfriend. Defendant's name, address, and vehicle were reported to police officers and the information was entered into the police computer such that the arriving Chicago police officers had the information. Further, the identifying information was also relayed to the Hazel Crest Police Department because defendant's residence was in Hazel Crest. Hazel Crest officers arrived at defendant's residence less than an hour after the shooting and observed defendant in the subject vehicle. He was taken into custody. Shortly thereafter, Chicago police officers arrived at the scene and a search of the vehicle took place. During the search, a firearm was discovered and subsequently recovered from the engine compartment of the vehicle.

¶ 54    Based on this evidence, it was a reasonable trial strategy by trial counsel not to challenge the probable cause for defendant's arrest, but instead to challenge the search of the vehicle. Defendant's identifying information was relayed by witnesses immediately after the shooting, such that, he was taken into custody outside his home while in the identified vehicle. We further reject defendant's circular argument that a probable cause challenge would have been meritorious

21

because the State's evidence was not sufficient where the State was not required to establish the unchallenged probable cause for arrest. Since defendant cannot satisfy either prong under the *Strickland* test, his claim of ineffective assistance fails.

¶ 55    We next turn to defendant's claims of error based on the additional arguments raised by trial counsel at the suppression hearing. First, defendant contends that the police lacked probable cause to support a warrantless search of his vehicle.

¶ 56    "A recognized exception to the fourth amendment's warrant requirement is the 'automobile exception,' which is based on the understanding that automobiles may be readily driven away often rendering it impossible for officers to obtain warrants for their search." *People v. Contreras*, 2014 IL App (1st) 131889, ¶ 28. "Under the automobile exception, police officers may search a vehicle without a warrant where probable cause exists to believe the automobile contains evidence of criminal activity subject to seizure." *Id*. "The reasonableness of a police officer's conduct must be judged based on his responsibility to prevent crime and apprehend criminals." *Id*. "After an officer is in possession of facts sufficient to support probable cause to believe that a vehicle contains contraband, the vehicle may be searched without a warrant and the search area includes any interior compartment of the vehicle that might reasonably contain the contraband." *Id*.

¶ 57    We find that the police had sufficient probable cause to justify a warrantless search of defendant's vehicle. The evidence presented at the suppression hearing established that defendant was detained while in his vehicle outside his address within an hour of the drive-by shooting in which he had been named as a suspect. As detailed above, defendant was immediately identified as the individual who fired multiple gunshots at partygoers at 6958 South Throop Street and injured multiple individuals. The Hazel Crest and Chicago police officers located and arrested defendant very shortly after the shooting. Based on the totality of the facts and viewed from the standpoint

of an objectively reasonable law enforcement officer, we agree with the trial court that the officers had a reasonable belief amounting to probable cause that the vehicle contained a firearm used in the shooting. Thus, no warrant was necessary to search defendant's vehicle. Accordingly, we find that the trial court did not err in denying defendant's motion to suppress evidence.

¶ 58     Since we have concluded that the police had probable cause to support a warrantless search of defendant's vehicle, we need not address the other grounds challenged to justify the search of defendant's vehicle. Nevertheless, we also find that the search was lawful as a property inventory search prior to the vehicle being towed.

¶ 59     "An inventory search of a lawfully impounded vehicle is a judicially created exception to the warrant requirement of the fourth amendment." *Gipson*, 203 Ill. 2d at 304. Inventory searches serve three objectives: (1) protection of the owner's property; (2) protection of the police against claims of lost or stolen property; and (3) protection of the police from potential danger. *Id*.

> "Three criteria must be met for a valid warrantless inventory search of a vehicle: (1) the original impoundment of the vehicle must be lawful; (2) the purpose of the inventory search must be to protect the owner's property, to protect the police from claims of lost, stolen, or vandalized property, and to guard the police from danger; and (3) the inventory search must be conducted in good faith pursuant to reasonable standardized police procedures and not as a pretext for an investigatory search." *People v. Nash*, 409 Ill. App. 3d 342, 348 (2011) (citing *People v. Hundley*, 156 Ill. 2d 135, 138 (1993)).

"In conducting such a search, the police must be acting pursuant to standard police procedures." *Gipson*, 203 Ill. 2d at 304. "[A] a police officer's testimony that he was following standard

23

procedure is generally deemed to be sufficient." *Id*. at 304-05. The Illinois Supreme Court has held that "there is no requirement that the procedures be in writing." *Id*. at 305.

¶ 60    The testimony from the officers at the suppression hearing was consistent that the car was going to be towed as part of the investigation. The Thunderbird had been identified as the shooter's vehicle at the scene. Detective Cotton stated that it was Hazel Crest practice to inventory and impound a vehicle under these circumstances. Officer Burke further testified that defendant's vehicle was being in towed in accordance with Chicago police procedures. When asked what the Chicago police policy was, Officer Burke responded, "If there are any personal items in the vehicle that need to be inventoried and also any dangerous weapons as well." The arrest report stated that vehicle was impounded.

¶ 61    As previously stated, a defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure, and, once a *prima facie* case is established, the burden shifts to the State to present evidence to counter the defendant's prima facie case. *Id.* at 306-07. However, the ultimate burden of proof remains with the defendant. *Id*. at 307. Here, defendant made his *prima facie* case by establishing that the search of his vehicle was conducted without a warrant. See *id*. However, Officer Burke provided unrebutted testimony that an inventory search prior to the towing of a vehicle is the standard procedure for the Chicago Police Department. He stated that the search was to inventory personal items as well as recover dangerous weapons. Defendant did not challenge this testimony as to the police policy. Rather, he focused on the fact that the search occurred prior to a tow report was completed or a call for a tow was made. The trial court heard the evidence and the arguments and concluded the officers had the right to go into the car and inventory the items inside the car. Defendant did not offer any additional evidence to rebut Officer Burke's testimony and the burden remained on him once the State presented evidence to

24

justify the warrantless search. The trial court properly denied defendant's motion to suppress on this basis as well.

¶ 62    Defendant next contends that the trial court erred by allowing the State to introduce a portion of Nakia's videotaped statement because the statement was not inconsistent with her trial testimony. Defendant admits that he failed to preserve this issue by including it in his posttrial motion, but asks this court to review it as plain error.

¶ 63    To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, the supreme court has held that the plain error rule is a narrow and limited exception to the general rules of forfeiture. *Id*.

¶ 64     Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that the admission of Nakia's prior statement falls under the first prong of plain error because the evidence was closely balanced. However, "[t]he initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 65     Section 115-10.1 allows for the admission of prior statements of a witness that are: (1) inconsistent with trial testimony; (2) the witness is subject to cross-examination concerning the statement; and (3) the prior statement was made under oath at a prior hearing or trial or describes an event that the witness had personal knowledge of and the statement is signed or sworn by the witness or recorded on audio or video tape. 725 ILCS 5/115-10.1 (West 2014). Here, defendant asserts that the admission of a portion of Nakia's videotaped statement was error because it was not inconsistent with her trial testimony. Defendant does not dispute that Nakia was subject to cross-examination or that the prior statement was made from her personal knowledge in a recorded statement. Defendant argues that he was prejudiced because "without being provided with the context in which the statement was made, the jury was free to speculate the worst as to what Nakia stated regarding how upset [defendant] was and what he was upset about."

¶ 66     "A witness' prior testimony, however, does not have to directly contradict testimony given at trial to be considered inconsistent within the meaning of that term set out in section 115-10.1." *People v. Flores*, 128 Ill. 2d 66, 87 (1989). Inconsistency under section 115-10.1 " 'may be found in evasive answers, *** silence, or changes in position.' " *Id*. (quoting *United States v. Williams*, 737 F.2d 594, 608 (7th Cir. 1984)). "The determination of whether a witness' prior testimony is inconsistent with his [or her] present testimony is left to the sound discretion of the trial court." *Id*. at 87-88.

¶ 67    In this case, Nakia's testimony regarding defendant's state of mind when he left her house was vague and equivocal. Nakia testified that when defendant wanted her to leave with him, she declined to go and that they "played the mad role all the time with each other." When asked if she and defendant were mad at each other, Nakia responded: "No, he wasn't that mad like that at me. He asked, you know, like, he waste [*sic*] gas coming down there, you know, because he coming [*sic*] to get me." Nakia was also asked at trial about the exchange during the videotaped interview where she was asked if defendant was mad when he left her house, and she responded in the affirmative. She answered at trial, "I guess. Yeah, I guess. I mean, he wasn't mad like that mad mad, you know." When asked again if she gave that answer, Nakia answered, "Maybe I did." On cross-examination, Nakia was asked if she and defendant "had maybe a lit[tle] spat or something," and she answered, "Yes."

¶ 68    In her videotaped statement, the ASA asked Nakia if defendant was "mad when he left" her house, and Nakia answered, "Yeah." This exchange was the only question and answer shown from Nakia's videotaped interview. The entire excerpt played at trial lasted 48 seconds. It included the brief introduction of the ASA and the detective present for the interview as well as the date and time of the interview and the subject of the interview, and then the single question and answer.

¶ 69    We find no error here. While Nakia's trial testimony did not directly conflict with her response in the videotaped statement, her trial testimony was evasive, equivocal, and minimized whether defendant was mad when he left her house prior to the shooting. Nakia downplayed that defendant "wasn't that mad" and he "wasn't like that mad mad." In contrast, during her videotaped interview when asked if defendant was mad when he left, she simply responded in the affirmative with no minimizing. We reject defendant's claim of prejudice based on speculation that the jury could have interpreted the brief excerpt broadly to imply the basis of defendant's anger. Defendant

offers no support beyond his speculation. No abuse of discretion occurred because Nakia's change in position was sufficient to be considered inconsistent with her prior statement under section 115-10.1. Since we have found no error occurred, there cannot be a plain error and defendant's argument fails.

¶ 70    Finally, defendant argues that his sentence of 66 years is unconstitutional as applied to him. Specifically, defendant contends that the convergence of the applicable sentencing statutes required the trial court to impose a sentence that amounts to a *de facto* natural life sentence without consideration of defendant's individual characteristics and that the sentence is so disproportionate to the offender and offense as to shock the conscience.

¶ 71    Here, defendant was sentenced on two counts of attempted first degree murder in which he personally discharged a firearm that proximately caused great bodily harm. Attempted first degree murder is a Class X felony with a sentencing range of 6 to 30 years. 720 ILCS 5/8-4(c)(1) (West 2014); 730 ILCS 5/5-4.5-25(a) (West 2014). Additionally, section 8-4(c)(1)(D) of the Criminal Code of 2012 (Code) (720 ILCS 5/8-4(c)(1)(D) (West 2014)) sets forth a sentence enhancement for a defendant who discharges a firearm in committing attempted first degree murder. The statute provides:

> "an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court[.]" *Id.*

Under this sentencing structure, the minimum sentence for each count of attempted first degree murder in which the offender personally discharged a firearm that proximately caused great bodily

harm is 31 years. Further, the court shall impose consecutive sentences when "[o]ne of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2014). Thus, the minimum aggregate sentence in defendant's case was 62 years, and the trial court imposed a combined sentence of 66 years.

¶ 72 Although defendant did not raise this claim in the trial court, a party may challenge the constitutionality of a statute at any time. *In re M.I.*, 2013 IL 113776, ¶ 39. The eighth amendment to the United States Constitution, applicable to the states via the fourteenth amendment, bars cruel and unusual punishment, namely punishment that is "inherently barbaric" or is disproportionate to the offense. *Graham v. Florida*, 560 U.S. 48, 59 (2010). The proportionate penalties clause requires that sentences should be determined " 'both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *People v. Rizzo*, 2016 IL 118599, ¶ 28 (quoting Ill. Const. 1970, art. I, § 11).

¶ 73 " 'Constitutional challenges carry the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional.' " *Rizzo*, 2016 IL 116599, ¶ 23 (quoting *People v. Patterson*, 2014 IL 115102, ¶ 90). "That presumption applies with equal force to legislative enactments that declare and define conduct constituting a crime and determine the penalties imposed for such conduct." *Id.* " 'To overcome this presumption, the party challenging the statute must clearly establish that it violates the constitution.' " *Id.* (quoting *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005)). "Courts have a duty to uphold the constitutionality of a statute whenever reasonably possible, resolving any doubts in favor of the statute's validity." *Id.* " 'An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party. [Citation.] In contrast, a facial challenge requires

a showing that the statute is unconstitutional under any set of facts, *i.e*., the specific facts related to the challenging party are irrelevant.' " *Id.* ¶ 24 (quoting *People v. Thompson*, 2015 IL 118151, ¶ 36). "The legislature's discretion in setting criminal penalties is broad, and courts generally decline to overrule legislative determinations in this area unless the challenged penalty is clearly in excess of the general constitutional limitations on this authority." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005).

¶ 74    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "A defendant can raise a proportionate penalties challenge on the basis that the penalty for a particular offense is too severe under the 'cruel or degrading' standard or that the penalty is harsher than the penalty for a different offense that contains identical elements." *People v. Williams*, 2015 IL 117470, ¶ 9 (quoting *Sharpe,* 216 Ill. 2d at 521). The supreme court has "never defined what kind of punishment constitutes 'cruel', 'degrading,' or 'so wholly disproportioned to the offense as to shock the moral sense of the community' " because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002).

¶ 75    Defendant asserts that the imposition of a 66-year sentence in his case shocks the moral sense of the community. Defendant was 33 years old at the time of sentencing and would not be eligible for release until he is 89 years old. Defendant contends that the convergence of the attempted first degree murder, the firearm enhancement, and consecutive sentencing statutes resulted in the imposition of a *de facto* natural life sentence without any consideration of his

rehabilitative potential. See 720 ILCS 5/8-4(c)(1)(D); 730 ILCS 5/5-4.5-25(a); 730 ILCS 5/5-8-4(d)(1) (West 2014).

¶ 76    The supreme court has recently held that 40-year sentence is long enough to be considered *de facto* natural life for *juvenile* defendants. *People v. Buffer*, 2019 IL 122327, ¶ 40. The supreme court has not found that a *de facto* natural life claim by an *adult* defendant implicates the proportionate penalties clause. The court also declined to base this number on statistical data of life expectancy in prison, but instead looked to the legislature. *Id.* "As this court recognized long ago, ' "[g]reat constitutional provisions must be administered with caution. *** It must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." ' " *Id.* (quoting *People ex rel. Douglas v. Barrett*, 370 Ill. 464, 467 (1939), quoting *Missouri, Kansas & Texas Ry. Co. v. May*, 194 U.S. 267, 270 (1904)). Assuming that defendant's sentence amounts to a *de facto* natural life sentence, the question is whether the imposition of this sentence for an adult offender shocks the moral sense of the community.

¶ 77    We find defendant's reliance on the Illinois Supreme Court's decision in *Miller* to be misplaced. Significantly, the defendant in *Miller* was a 15-year-old minor at the time of the offense and the court noted that the sentence was imposed based on the convergence of three statutes, the automatic transfer of juveniles 15 or 16 years old charged with murder to criminal court (705 ILCS 405/5-4(6)(a) (West 1996)), the accountability statute (720 ILCS 5/5-2(c) (West 1996)), and the mandatory natural life sentencing statute (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)). *Id.* at 340. The defendant had "one minute to contemplate his decision to participate in the incident," where he "stood as a lookout during the shooting, but never handled a gun." *Id.* at 341. The defendant was ultimately sentenced to a mandatory life term under the multiple-victims murder statute. The

supreme court found the convergence of the transfer, accountability, and multiple-victims murder statutes, combined with the fact that the juvenile defendant was "the least culpable offender imaginable," rendered his sentence unconstitutional. The court declared that a mandatory life sentence in that instance "grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community." *Id*. The court further noted that its decision was consistent with the longstanding distinction between juvenile and adult offenders, while observing that the multiple-victims murder statute had been upheld with respect to both juvenile principals and adult accomplices. *Id*. at 341-42. "A life sentence without the possibility of parole implies that under any circumstances a juvenile defendant convicted solely by accountability is incorrigible and incapable of rehabilitation for the rest of his life." *Id*. at 342-43.

¶ 78    In contrast, defendant was far from the "least culpable offender imaginable." Defendant, who was 31 years old at the time of the offense, personally discharged the firearm causing great bodily harm to two victims, Harvey and Wright, and he was sentenced for those two distinct offenses. Defendant cites several other cases in which reviewing courts have considered *de facto* natural life sentences for minors and intellectually disabled adults, but provides no authority in which a challenge by a competent adult was permitted. See *People v. Coty*, 2018 IL App (1st) 162383, *appeal allowed*, No. 123972 (Jan. 31, 2019) (finding that intellectually disabled adults, like juveniles, are less culpable and should be treated similarly to minors); *People v. Sanders*, 2016 IL App (1st) 121732-B, *pet. leave to appeal pending*, No. 121275 (reversing dismissal of second successive postconviction proceeding where a 17-year-old offender received an aggregate sentence of 100 years); *People v. Barnes*, 2018 IL App (5th) 140378 (reviewing court found the

imposition of mandatory 15-year firearm enhancement violated the proportionate penalties as-applied to a 17-year-old juvenile offender).

¶ 79    Defendant does not explicitly argue that the specific sentence imposed violates the proportionate penalties, nor does he challenge the mandatory firearm enhancement or the mandatory consecutive sentences. Rather, his argument is that the application of the relevant sentencing statutes mandated a sentence that was "so disproportionate to [defendant's] rehabilitative potential and the realities of the offense as to shock the conscience." He argues that there is no evidence that he is an incorrigible criminal beyond hope of rehabilitation, he lacks the criminal history in which he has continued to commit crimes after serving significant time, his employment history mitigated against a long sentence, and the sentence imposed is "all out of proportion to the facts of this case."

¶ 80    While defendant's asserted mitigating factors may be true, we must also view the sentence imposed in relation to defendant's conduct as well as the legislature's discretion in setting criminal penalties. In this case, defendant left his girlfriend's home while a party was occurring in front of the house. He entered his car and rather than drive to his own house, he fired a gun repeatedly at the crowd of partygoers. Even after the first pulls of the trigger failed to fire a bullet, defendant continued to pull the trigger and fired five to six gunshots at multiple people, striking three individuals. Harvey was struck in his left shoulder where the bullet remains because a surgery to remove the bullet would cause more damage. Wright was struck on his side which required immediate surgery and the removal of his spleen. After the shooting, defendant left the scene and was subsequently arrested outside his home in Hazel Crest. A revolver was found in the engine compartment of the car, behind one of the headlights.

¶ 81    The jury found defendant guilty of the attempted first degree murders of Harvey and Wright with the additional finding that he personally discharged a firearm that proximately caused great bodily harm. The supreme court has consistently upheld the constitutionality of the firearm enhancement. "[I]t is neither cruel nor degrading, nor would it shock the moral sense of the community, to apply the 15/20/25-to-life enhancements to attempted first degree murder." (Emphasis omitted.) *Sharpe*, 216 Ill. 2d at 524 (citing *People v. Morgan*, 203 Ill. 2d 470, 488 (2003)). The *Sharpe* court further held that " it would not shock the conscience of the community to learn that the legislature has determined that an additional penalty ought to be imposed when murder is committed with a weapon that not only enhances the perpetrator's ability to kill the intended victim, but also increases the risk that grievous harm or death will be inflicted upon bystanders." *Id*. at 525.

¶ 82    Defendant was subject to mandatory consecutive sentences because both of the offenses for which the defendant was convicted, attempted first degree murder of two victims, was a Class X and the defendant inflicted severe bodily injury. 730 ILCS 5/5-8-4(d)(1) (West 2014). The Illinois Supreme Court has long held that consecutive sentences constitute separate sentences for each crime of which a defendant has been convicted." *People v. Carney*, 196 Ill. 2d 518, 529 (2001). The supreme court observed that it had previously held "when consecutive sentences are imposed, they do not form a single sentence for any purpose other than determining the manner in which the sentences are to be served for the purpose of determining an offender's eligibility for parole." *Id*. at 530 (citing *People v. Thomas*, 143 Ill. 2d 271, 278-79 (1991)). "Our jurisprudence, therefore, makes it clear that consecutive sentences do not constitute a single sentence and cannot be combined as though they were one sentence for one offense. Each conviction results in a discrete sentence that must be treated individually." *Id*.

¶ 83    We conclude that defendant's sentence did not violate the proportionate penalties clause. Both the mandatory firearm enhancements and the consecutive sentencing provision seek to account for the seriousness of weapons offenses and the resulting great bodily injury to the victims. We further note that defendant received near the minimum sentence for each attempted first degree murder conviction. The minimum sentence was 31 years, and the trial court sentenced defendant to 33 years on each conviction. While we appreciate defendant's mitigating factors, including his lack of a violent criminal history and work history, defendant has failed to overcome the presumption that the statutes were applied constitutionally in this case. Given the violent and serious nature of defendant's actions, consecutive sentences of 33 years do not shock the moral sense of the community and does not violate the proportionate penalties clause of the Illinois Constitution.

¶ 84                                    III. CONCLUSION

¶ 85    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 86    Affirmed.